Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.; COMMUNITIES FOR A BETTER ENVIRONMENT; COALITION FOR A SAFE ENVIRONMENT; and DESERT CITIZENS AGAINST POLLUTION,, | **Case No:** CV-08-05403-GW |
| Plaintiff, | **DECISION ON DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P 12(b)(1) and (6)** |
| v. | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; GOVERNING BOARD OF THE SOUTH COAST AIR QUALITY MANAGE-MENT DISTRICT; and BARRY WALLERSTEIN, Executive Office, | |
| Defendants. | |

## I. INTRODUCTION

This case is a citizen suit under Section 304 of the Clean Air Act (sometimes referenced herein as the "Act"), 42 U.S.C. § 7604, brought by the Natural Resources Defense Council, Communities for a Better Environment, Coalition for a Safe Environment, and Desert Citizens Against Pollution (collectively "Plaintiffs") against the South Coast Air Quality Management District, its Governing Board and Executive Officer (collectively "Defendants"). The case

1   involves the "offset" requirements of Defendants' "new source review" program
2   required by Section 174 of the Act (42 U.S.C. § 7503(c)) for "nonattainment"
3   regions.  Under that program, before Defendants may allow construction of certain
4   types of new and/or modified sources of air pollution, they must ensure that any
5   emissions increases are offset by corresponding emissions reductions.  Plaintiffs
6   have challenged the validity of certain "internal" offsets (such as "priority reserve
7   allocations") which Defendant South Coast Air Quality Management District
8   ("SCAQMD") periodically utilizes and holds in an "internal bank."

9        On August 18, 2008, Plaintiffs filed this action seeking declaratory and
10  injunctive relief after giving more than 60 days notice to the Defendants and the
11  United States Environmental Protection Agency ("EPA").  On October 8, 2008,
12  Defendants filed a motion to dismiss under Federal Rules of Civil Procedure
13  ("F.R.C.P.") 12(b)(1) and 12(b)(6) on the grounds that this court lacks jurisdiction
14  to hear the claims set forth in the Complaint, and/or the Complaint fails to state a
15  claim for which relief can be granted.  Hearings on that motion were held on
16  December 11, 2008 and on February 2, March 19, May 5, July 6,[1] and August 31,
17  2009.  After considering the moving, opposition, reply and supplemental briefs, the
18  concomitant exhibits, the documents in the case file, materials subject to judicial
19  notice, and the oral arguments at the hearings, the court grants Defendants' motion
20  to dismiss for the reasons stated by this court at the hearings and as further
21  memorialized herein.

22  **II. <u>BACKGROUND</u>**

23       The Clean Air Act sets forth a comprehensive regulatory scheme for the
24  reduction and prevention of air pollution by the States and the Federal
25  Government.  *General Motors Corp. v. United States*, 496 U.S. 530, 532, 110 S.Ct.

26  ───────────────
[1] On July 6, 2009, a motion to intervene (as defendants) was granted as to Southern California
27  Edison Co., Walnut Creek Energy LLC, Los Angeles Area Chamber of Commerce, Los Angeles
    County Business Federation, El Segundo Power, CPV Sentinel LLC, County Sanitation District
28  No. 2 of Los Angeles County, and Orange County Sanitation District.

1  2528, 110 L.Ed.2d 480 (1990); *Latino Issues Forum v. United States EPA*, 558
2  F.3d 936, 938 (9th Cir. 2009).  The scheme is designed to achieve and maintain
3  compliance with the "National Ambient Air Quality Standards" ("NAAQS")
4  established by the EPA.[2]  For planning purposes, EPA has divided each state into
5  separate "air quality control regions." 42 U.S.C. § 7407; 40 C.F.R. Part 81.  EPA
6  classifies each region based on whether the region meets the NAAQS.  42 U.S.C.
7  § 7407(d); 40 C.F.R. Part 81, Subpart C.  If a region has not achieved the NAAQS
8  for a particular pollutant,[3] EPA designates that region as "nonattainment" for that
9  pollutant. 42 U.S.C. § 7501(2).

10  The NAAQS are maintained in part through "State Implementation Plans" or
11  "SIPs."  42 U.S.C. § 7410(a)(1).  SIPs contain specific control measures that are
12  designed to achieve compliance with the NAAQS within the designated air quality
13  control regions.  The Act sets forth a number of general requirements for the
14  content of SIPs.  42 U.S.C. § 7410(a)(2).  SIPs must contain certain types of
15  control measures including, *inter alia*, emissions limitations, compliance
16  schedules, monitoring requirements, and enforcement mechanisms.  *Id.*  Within
17  these general parameters, however, the states have substantial discretion to
18  determine the specific air pollution control strategies set forth in their SIPs.  *See*
19  *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 470, 124 S.Ct.
20  983, 157 L.Ed.2d 967 (2004); *Union Electric Co. v. EPA*, 427 U.S. 246, 250, 96
21  S.Ct. 2518, 49 L.Ed.2d 474 (1976).  Each state is free to determine the particular
22  "mix of emissions limitations" set forth in a SIP, as long as the SIP will achieve
23  and maintain compliance with the NAAQS.  *Train v. Natural Res. Defense*
24  *Council*, 421 U.S. 60, 79, 95 S.Ct. 1470, 43 L.Ed.2d 731(1975); *see also Union*
25  *Electric Co.*, 427 U.S. at 250.

26  [2] The NAAQS are set at levels that are protective of human health, with an adequate margin of
27  safety.  42 U.S.C. § 7409(b); 40 C.F.R. § 50.2(b).

[3] EPA has established NAAQSs for six air pollutants: carbon monoxide, lead, nitrogen dioxide,
28  ozone, particulate matter and sulfur dioxide. *See* 40 C.F.R. Part 50.

3

The Act sets forth a detailed process for the preparation, adoption, and revision of SIPs. 42 U.S.C. § 7410. Each state must prepare a proposed SIP and submit it to EPA for review and approval. *Id.* at § 7410(a). EPA must consider whether the SIP meets all applicable requirements under the Act. *Id.* at § 7410(k)(3). Once EPA approves a SIP, the SIP "has the force and effect of federal law. *Safe Air for Everyone v. U.S. EPA*, 488 F.3d 1088, 1096-97 (9th Cir. 2007); *Oregon Envtl. Council v. Oregon Dep't of Envtl. Quality*, 775 F.Supp. 353, 355 (D. Or. 1991). After approval, EPA can require revisions to an existing SIP if EPA determines that the SIP is substantially inadequate to achieve or maintain the NAAQS, or otherwise fails to comply with the Clean Air Act. 42 U.S.C. § 7410(k)(5). EPA requests for SIP revisions are commonly referred to as "SIP calls." *See e.g. Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1348 (11th Cir. 2006).

## A. The Clean Air Act's Offsets Requirement for SIPs

The Act sets forth certain requirements for nonattainment area SIPs. *See* Clean Air Act, Subchapter I, Part D, 42 U.S.C. §§ 7501-09a. Among other control measures, each nonattainment area SIP must contain a permitting program governing the construction and operation of "new and modified major stationary sources." 42 U.S.C. § 7502(c)(5). Such permit programs are often referred to as "new source review" or "NSR" programs. Each new source review program must set forth "pre-construction review" requirements that applicants must meet before the permitting agencies may issue permits to construct or operate any equipment that will increase nonattainment emissions. 40 C.F.R. § 51.165(a)(2).

This case involves the Act's "offset" provision, set forth in Section 173 of the Act (42 U.S.C. § 7503). Section 173(a)(1) provides that each new source review permit program set forth in a nonattainment area SIP must require that emission increases from new and modified major sources be offset by corresponding emissions reductions. Section 173(a)(1) states in relevant part as

4

follows:

> The permit program required by section 7502(b)(6)[4] of this title shall provide that permits to construct and operate may be issued if--
>> (1) . . . the permitting agency determines that—
>>> (A) by the time the source is to commence operation, sufficient offsetting emissions reductions have been obtained, such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources (as determined in accordance with the regulations under this paragraph) prior to the application for such permit to construct or modify so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title) . . . .

An "offset" is a reduction of nonattainment pollutant emissions in an amount equal to, or somewhat greater than, the emissions increase of the same pollutant from the proposed new or modified stationary source or equipment. 42 U.S.C. § 7503(c)(1). A company might be allowed to create offsets, for example, by permanently shutting down a permitted piece of equipment, or curtailing production or operating hours. 40 C.F.R. § 51.165(a)(3)(i)(C)(1). Once created, companies may also be able to "bank" offsets, use them at a later time, and/or sell them to other companies.[5]

Each specific SIP offset requirement adopted pursuant to Section 173(a)(1) must meet the general criteria set forth in Section 173(c). Section 173(c) generally states that permit programs in the SIP must provide, *inter alia*, that: 1) the offsets come from the same geographic area as the new source (Section 7503(c)(1)), 2) the

---

[4] This citation in the current version of the statute is a typographical error. The citation should refer to 42 U.S.C § 7502(c)(5), not 7502(b)(6).

[5] U.S. Environmental Protection Agency "Emissions Trading Policy Statement; General Principles for Creation, Banking and Use of Emission Reduction Credits," 51 Fed. Reg. 43814 (December 4, 1986).

offsets be "in effect and enforceable" by the time that the new source commences operation (*id.*), and 3) the offsets be "surplus" in the sense that they are not otherwise required by the Clean Air Act.   42 U.S.C. § 7503(c)(2).   In adopted regulations, EPA has provided further guidance on the required content of new source review programs, and offset requirements in particular. *See generally*, 40 C.F.R. § 15.165.

If the EPA determines that a State is not adequately implementing the provisions of its SIP for the nonattainment region in which a proposed new source of air pollutant emissions is to be constructed or modified, the EPA can order that no permits be issued by the State or its designee within the area until the problem is remedied.   42 U.S.C. § 7503(a)(4).[6]

## B. **Regulation XIII's Offset Requirements for Sources**

EPA has designated the "South Coast Air Basin" ("South Coast Basin" or "Basin") as an air quality region under the Act. It consists of the urban portions of Los Angeles, Riverside, and San Bernardino Counties, and all of Orange County. 40 C.F.R. § 81.305.   The South Coast Basin is currently in attainment for nitrogen dioxide, sulfur dioxide, lead and carbon monoxide.   40 C.F.R. § 81.305.   Because of its large population and unique meteorology,[7] however, the Basin is currently nonattainment for ozone and particulate matter ("$PM_{10}$").   40 C.F.R. § 81.305.

Pursuant to state law, SCAQMD is responsible for preparing and

---

[6] As provided in 42 U.S.C. § 7413(a)(2), if the EPA finds that violations of an applicable SIP or an approved permit program are so widespread that such violations appear to result from a failure of the State to enforce its plan or program effectively, the EPA "shall so notify the State" and, if such failure extends beyond the 30th day after such notice (or 90 days in the case of a permit program), the EPA is to give public notice of such finding and the EPA will thereafter enforce the SIP requirements and/or permit program until such time as the State satisfies the EPA that it will adequately enforce the plan and/or program.

[7] *Cf.* CAL. HEALTH & SAFETY CODE § 40402(b) (acknowledging the "critical air pollution problems" in the South Coast Air Basin caused by millions of motor vehicles, stationary sources, atmospheric inversion layers, and large amounts of sunshine).

implementing the South Coast Basin SIP.[8]   To a large degree, the South Coast Basin SIP consists of SCAQMD's adopted Rules, to the extent that those Rules have been approved by EPA as part of the SIP.  Because the South Coast Basin remains in nonattainment for certain pollutants, the South Coast Basin SIP contains a new source review program.   This program is set forth in the SIP-approved portions of SCAQMD's Regulation XIII.[9]  EPA approved the then-existing version of Regulation XIII as part of the SIP in 1996.[10]  *See* "Approval and Promulgation of Implementation Plan for South Coast Air Quality Management District" ("1996 SIP Approval") 61 Fed. Reg. 64291 (December 4, 1996), attached as Exhibit L, at page 79 of Defendants' Request for Judicial Notice re Supplemental Brief in Support of Motion to Dismiss ("DRJN"), Docket Item No. 44.  Thus, Regulation XIII establishes the new source review SIP requirements for the South Coast Basin and, as approved by the EPA, has the force and effect of federal law.  *See Communities for a Better  Environment v. Cenco Refining Co.*, 180 F.Supp.2d 1062, 1068 (C.D. Cal. 2001).

Regulation XIII is designed to "achieve no net increases from new or modified permitted sources of nonattainment air contaminants or their precursors." *See* Rule 1301(a), Exhibit A, page 9 of DRJN.  To that end, Regulation XIII sets forth preconstruction review requirements for new and modified sources of nonattainment emissions. The requirements of Regulation XIII are triggered by an application for a permit to construct under SCAQMD's Regulation II.  *See*

---

[8] SCAQMD must prepare and adopt an "air quality management plan" ("AQMP") for the South Coast Basin. CAL. HEALTH & SAFETY CODE §§ 40408 and 40460.  The AQMP serves as the South Coast Basin SIP under the Clean Air Act. *Id.* at § 40460(d).

[9] The EPA SIP-approved portions of Regulation XIII currently consists of the following Rules, as adopted by SCAQMD on the dates noted in parentheses: Rule 1301 (December 7, 1995); Rule 1302 (December 7, 1995); Rule 1303 (May 10, 1996); Rule 1304 (June 14, 1996); Rule 1306 (June 14, 1996); Rule 1309 (December 7, 1995); Rule 1309.1 (December 7, 1995 and modified on May 3, 2002); Rule 1310 (December 7, 1995);  and Rule 1313 (December 7, 1995). *See* 61 Fed. Reg. 64291.

[10] Since 1996, the SCAQMD has promulgated and implemented an additional provision into Regulation XIII, *e.g.* Rule 1315, which have not yet received EPA's approval.

7

1    *generally* 64 Fed. Reg. 25828 (May 13, 1999).

2    Rule 1303 identifies the specific requirements that an applicant must meet
3    before the District will issue a permit to construct for a new or modified source of
4    nonattainment emissions.    Rule 1303(b)(2) sets forth SCAQMD's basic offset
5    requirements.    That section provides in pertinent part as follows:

6    The Executive Officer or designee shall, except as Rule 1304
     applies, deny the Permit to Construct for any new or modified
7    source which results in a net emission increase of any
8    nonattainment air contaminant at a facility, unless each of the
     following requirements is met: . . . .
9              (2)    Emission Offsets
10            Unless exempt from offsets requirements pursuant to Rule
     1304, emission increases shall be offset by either Emission
11   Reduction Credits approved pursuant to Rule 1309, *or* by
12   allocations from the Priority Reserve in accordance with the
     provisions of Rule 1309.1.
13

14   Rule 1303(b)(2) (emphasis added), Exhibit C, pages 31-32 of DRJN.

15    Pursuant to Rule 1303(b)(2), it is possible to satisfy the emission offset
16   requirement through two different types of offsets. *Id.* at page 31. The first type of
17   offset is created pursuant to Rule 1309, when a private company applies to
18   SCAQMD to convert emission reductions into marketable "emission reduction
19   credits" ("ERCs"). *See* Exhibit G, page 56 of DRJN. Upon approval of an
20   application under Rule 1309(c), the ERCs are registered in the applicant's name.
21   *Id.* at page 58. The ERCs then become a marketable commodity that can be used,
22   banked, or sold. *See id.*, and Rule 1309(d) and (e). Rule 1309(b) sets forth the
23   requirements for issuing ERCs to private applicants. *Id.* at pages 56-57. Under
24   Rule 1309(b)(1), each application must contain a variety of specified information.[11]

25   ─────────────────────
[11] The applicant for an ERC must supply documentation regarding: (a) the amount and type of
26   emission reductions; (b) the date on which the emission reduction took place or is planned to
     take place; (c) the Regulation Zone from which the ERC is to originate; (d) the reason for the
27   emission reduction, such as a process change, addition of control equipment or facility
     shutdown; and (e) the surrender of applicable operating permits whenever emission reductions
28   are the result of either equipment or facility shutdown. Rule 1309(b)(1).

Rule 1309(b)(4) sets forth eligibility requirements for emissions reductions that the applicant seeks to convert into ERCs. *Id.* at page 57.

The second type of offset recognized in Rule 1303(b)(2) are "allocations from the Priority Reserve [issued] in accordance with provisions of Rule 1309.1." *See* Exhibit C, page 32 of DRJN. Rule 1309.1 provides for the establishment of a "Priority Reserve" to provide offset credits for certain specified "priority sources" *See* Exhibit H, pages 61-62 of DRJN. Rule 1309.1 does not delineate how the Priority Reserve credits are to be generated.

In September of 2006, SCAQMD promulgated Rule 1315 to establish "procedures [to be] . . . used by the Executive Officer to demonstrate that the sources . . . which obtain emission credits through allocation from District Rule 1309.1-Priority Reserve . . . are fully offset by valid emission credits." Exhibit K, page 72 of DRJN. Pursuant to Rule 1315(c)(3), the SCAQMD, on its own initiative, identifies or "tracks" emissions reductions that have not been converted into private ERCs. *Id.* at pages 74-75. The term "tracking" as used in this context refers to the process of identifying emissions reductions and determining that they are eligible to be converted into offsets. *Id.* Emission reductions tracked by SCAQMD result from "orphan shutdowns," "orphan reductions," and certain other activities.[12] *Id.* Those reduction amounts are placed in a category referenced in Rule 1315(c)(3) as "Offset Account Credits for Federal NSR Equivalency." *Id.* at page 74. Since 1990, SCAQMD has been converting orphan emissions reductions into offsets and depositing the resulting offsets into an internal bank. Pursuant to Rule 1315(c)(1), in addition to the Offset Account Credits for Federal NSR Equivalency, SCAQMD also had a "separate District offset account" for five specified pollutants which was established effective October 1, 1990 with initial

---

[12] An "orphan shutdown" occurs when a piece of equipment is permanently shut down and the owner does not apply to the SCAQMD for ERCs. Rule 1315(b)(3). An "orphan reduction" occurs when there is a reduction in actual emissions due to a physical change to the permitted source or its method of operations so long as the change is not otherwise required by law and does not otherwise result in the issuance of an ERC. Rule 1315(b)(2).

1   balances listed in Table A of Rule 1315. *See id.* at page 73. However, any of

2   those credits which had not been used by the end of 2005 were to be withdrawn

3   and deemed unavailable for utilization thereafter.[13]

4       SCAQMD periodically withdraws offset credits from the internal bank and

5   utilizes them for one of two purposes: 1) to counterbalance emissions from new

6   and modified sources that are exempt from Rule 1303(b)(2)'s offsets requirement

7   pursuant to Rule 1304 (*see* Exhibit D to DRJN); and 2) to provide offsets to certain

8   "priority" sources that are eligible to receive offsets pursuant to Rule 1309.1 (*see*

9   Exhibit H to DRJN). Rule 1304 provides, *inter alia*, that certain types of specified

10  projects are exempt from Rule 1303(b)(2)'s emission offset requirements. Since

11  federal law contains no such exemption, SCAQMD provides offsets for these

12  sources from its internal bank when issuing permits for those projects.[14] Rule

13  1309.1 allows specified sources to obtain internal offsets from an account in the

14  internal bank known as the "priority reserve account." *Id.* Under the original

15  version of Rule 1309.1, priority reserve offsets were available for innovative

16  technology companies, research operations, and "essential public services" such as

17  sewage treatment, police and firefighter facilities. Rule 1309.1 was later amended

18  to allow access for certain power plant projects. *Id.*; *see also* 71 Fed. Reg. 35157,

19  attached as Exhibit M to DRJN.

---

20  [13] As stated in Rule 1315(c)(1):

21      Any portions of the initial account balances identified in Table A

22      remaining in the District offset accounts at the end of calendar year
        2005 shall be removed from the District offset accounts by the

23      Executive Officer and shall not be used for purposes of demonstrating
        equivalency between federal NSR offset requirements and the

24      District's NSR program.

25  *See* Exhibit K to DRJN at page 73.

26  [14] *See generally* U.S. EPA, Region IX, Air and Toxics Division, "Technical Support Document
    for EPA's Notice of Final Rulemaking for the California State Implementation Plan, South Coast
    Air Quality Management District, New Source Review" ("10/29/96 EPA Technical Support

27  Document"), Gerardo C. Rios, October 29, 1996, at pages 15-16. The 10/29/96 EPA Technical
    Support Document is attached as Exhibit A to Plaintiffs' Request for Judicial Notice in Support

28  of Opposition to Motion to Dismiss, Docket Item No. 23.

1    The SIP for the South Coast Basin distinguishes between privately held
2  "ERCs" created pursuant to Rule 1309, and offsets held in SCAQMD's internal
3  bank.[15]  *See, e.g.*, Rule 1303(b)(2), Exhibit C to DRJN at page 32.  Thus, the term
4  "ERC" will be used herein to refer to privately held offsets created pursuant to the
5  application process set forth in Rule 1309.  The term "internal offsets" will be used
6  to refer to offsets created by SCAQMD on its own initiative and contained in
7  SCAQMD's internal bank.

8    As explained above, ERCs and internal offsets are used for the same basic
9  purpose – to satisfy Rule 1303(b)(2)'s offset requirement.  The creation of ERCs
10  and internal offsets, however, are subject to different, and in some cases
11  conflicting, requirements.  The requirements for creating ERCs are codified in
12  Rules 1309 and 1306.  Rule 1309(b)(4) sets forth the "emission reduction
13  eligibility requirements" that applicants must meet in order to obtain ERCs.  It
14  provides, *inter alia*, as follows:

15    The applicant must demonstrate to the Executive Officer or
designee that all stationary and mobile source reductions are:
16    (A)   real;
17    (B)   quantifiable;
    (C)   permanent;
18    (D)   federally enforceable; and
19    (E)   not greater than the equipment would have achieved if
          operating with current Best Available Control
20          Technology.

21
22  Rule 1309(b)(4), Exhibit G, page 57 of DRJN.  In addition, Rule 1309(b)(5) sets
23  forth what is commonly known as a "surplus" requirement for offsets.  When an
24  applicant proposes to convert an emission reduction into an ERC, the emission

25
26  [15] Regulation XIII, as EPA SIP-approved, consistently uses the term "ERC" to refer to privately held offset credits that result from an application under Rule 1309.  In contrast, depending on the context, Regulation XIII refers to internal offsets as "Priority Reserve allocations," "Priority
27  Reserve Credits," "Priority Reserve Offsets," or "offsets obtained pursuant to the exemption provisions of Rule 1304."  Rule 1306(e)(3) explicitly excludes "Priority Reserve allocations"
28  from the calculation of "Emission Reduction Credits."  *See* Exhibit F to DRJN at page 53.

reduction cannot otherwise be required by existing federal requirements.   The emission reduction must, in other words, be "surplus" to existing federal requirements.   Rule 1309(b)(4) also provides that ERCs must be calculated pursuant to Rule 1306. Rule 1306(e) sets forth the method for calculating the amount of ERCs to be granted to an ERC applicant under Rule 1309.[16]   *See* Exhibit F to DRJN.   Rule 1306(c) further describes a specific methodology that must be used for calculating emission decreases.

In contrast to ERCs, the requirements for creating internal offsets are not codified in the EPA SIP-approved portions of Regulation XIII.  The requirements for creating internal offsets are set forth in SCAQMD's offset "tracking system." From 1990 to 2006, this tracking system was utilized but uncodified.  In September of 2006, SCAQMD codified the tracking system by promulgating SCAQMD Rule 1315.   While Rule 1315 is part of Regulation XIII, it is not part of the federally enforceable SIP because it has not yet been approved by EPA.

When SCAQMD submitted the then-existing Regulation XIII to EPA for SIP approval in 1995, the submittal included a summary of SCAQMD's internal offset tracking system.[17]   Because Regulation XIII as proposed in 1995 would allow SCAQMD to utilize internal offsets in connection with Rules 1304 and 1309.1, EPA specifically considered whether SCAQMD's internal offset tracking system met the requirements of Section 173. *See* 10/29/96 EPA Technical Support Document at pages 15-16.  EPA determined at that time that the tracking system did in fact satisfy the legal requirements of Section 173(c). *Id.*; *see also* 1996 SIP Approval, 61 Fed. Reg. 64291.   In 2006, in approving the most recent version of Rule 1309.1, EPA reiterated its determination that SCAQMD's tracking system

---

[16] Rule 1306(a) also sets forth requirements for calculating emissions increases and decreases in connection with determining (1) whether Regulation XIII applies to a particular proposed new or modified source; and (2) the amount of offsets required for a particular proposed new or modified source.

[17] *See* 10/29/96 EPA Technical Support Document at page 16; *see also* 71 Fed. Reg. 35157, 35158.

12

and internal offsets meet the requirements of Section 173. *See* "Revisions to the California State Implementation Plan, South Coast Air Quality Management District," 71 Fed. Reg. 35157 (June 19, 2006), attached as Exhibit M to DRJN. EPA explained as follows: "In approving Rule 1309.1 in 1996, we determined that the District's implementation of a tracking system demonstrated that the Priority Reserve bank's emission reduction credits complied with the requirements of section 173(c) [of the Clean Air Act]."[18] *Id.* at 35158.

## III.  F.R.C.P. 12(b)(1) AND 12(b)(6)

F.R.C.P. Rule 12(b)(1) authorizes a motion to dismiss based on lack of subject matter jurisdiction. Both the Constitution and Congress place limits on the jurisdiction of federal courts. These limits "[m]ust be neither disregarded nor evaded." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The plaintiff has the burden to establish that subject matter jurisdiction is proper, and, "[i]f [it] does not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment." *Kokkonen v. Guardian Life Ins. Co.* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Tosco Corp. v. Communities for a Better Env't*, 236, F.3d 495, 499 (9th Cir. 2001).

F.R.C.P. Rule 12(b)(6) authorizes a motion to dismiss based on failure to state a claim for which relief can be granted. A motion to dismiss for failure to state a claim is properly granted where the plaintiff fails to plead a cognizable legal theory, or where the plaintiff fails to plead sufficient facts under a cognizable legal theory. *Johnson v. Riverside Healthcare System*, 534 F.3d 1116, 1121 (9th Cir. 2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-62, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (dismissal for failure to state a claim does not

---

[18] In connection with EPA's 2006 approval of modifications to Rule 1309.1, an organization called "California Unions for Reliable Energy" ("CURE") filed written comments objecting to Rule 1309.1 as revised. With those comments, CURE made the same basic allegation which is set forth in Plaintiffs' Complaint – that SCAQMD's internal offsets do not meet the requirements of Section 173(c). As the cited passage shows, EPA rejected that contention.

1   require the appearance, beyond a doubt, that the plaintiff can prove "no set of
2   facts" in support of its claim that would entitle it to relief). Under Rule 12(b)(6), a
3   court must 1) construe the complaint in the light most favorable to the plaintiff, and
4   2) accept all well-pleaded factual allegations as true, as well as all reasonable
5   inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266
6   F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir.
7   2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The court need not
8   accept as true "legal conclusions merely because they are cast in the form of
9   factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139
10  (9th Cir. 2003). "Although conclusory allegations of law and unwarranted
11  inferences are insufficient to avoid a Rule 12(b)(6) dismissal, a complaint need not
12  contain detailed factual allegations; rather, it must plead enough facts to state a
13  claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063,
14  1067-68 (9th Cir. 2009) (omitting internal quotation marks and citations). In its
15  consideration of the motion, the court is limited to the allegations on the face of the
16  complaint (including documents attached thereto), matters which are properly
17  subject to judicial notice, and "documents whose contents are alleged in a
18  complaint and whose authenticity no party questions, but which are not physically
19  attached to the pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89
20  (9th Cir. 2001); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir.), *cert. denied*,
21  512 U.S. 1219 (1994).

22  **IV. DISCUSSION**

23      **A. Introduction**

24      Plaintiffs here proceed under Section 304(a) of the Clean Air Act, 42 U.S.C.
25  § 7604(a)(1). Section 304(a) provides in relevant part that "any person may
26  commence a civil action on his own behalf" in a federal district court:

27      . . . against any person (including . . . any other governmental
28      instrumentality or agency . . .) who is alleged to have violated (if

there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter . . . .

42 U.S.C. § 7604(a). An "emission standard or limitation under this chapter" is defined, in relevant part, at 42 U.S.C. § 7604(f) as follows:

> (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,
> . . . .
> (3) any condition or requirement of a permit under . . . part D of subchapter I [42 USCS §§ 7501 et seq.] (relating to non-attainment), . . . any condition or requirement under an applicable implementation plan relating to . . . air quality maintenance plans . . . ; or
> (4) any other standard, limitation, or schedule established under any permit issued pursuant to . . . any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations[,]
> which is in effect under this Act (including a requirement applicable by reason of section 118 [42 USCS § 7418]) or under an applicable implementation plan.

Any challenge to review the EPA "Administrator's action in approving or promulgating any implementation plan under [42 U.S.C.] section 7410 . . . or under regulations thereunder . . . or any other final action of the Administrator under [42 U.S.C. Chapter 85, §§ 7401-7671q] . . . which is locally or regionally applicable may be filed *only* in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 7607(b)(1) (emphasis added).

Plaintiffs' Complaint herein asserts that SCAQMD does not have any tracking system or other means of verifying the validity of the emission reduction credits which it monitors and/or distributes. See Complaint at ¶ 31. Consequently, Plaintiffs contend that "SCAQMD cannot now or in the future, and may never have been able to, demonstrate that those credits are real, surplus, enforceable, quantifiable, and permanent, as required by the Act, implementing regulations and

15

guidance, and California SIP requirements." Id.  Plaintiffs also charge that within the "SCAQMD's offset accounts" are credits which were initially recognized in the SCAQMD's original "state trading program, which existed before the 1990 Amendment [to the Act]." Id. at ¶ 38 ("When Congress amended the Act in 1990, SCAQMD purportedly deposited the credits from its state account into the new federal NSR program accounts."). Id.  Plaintiffs refer to those items as "pre-1990 credits."[19] Id.

Plaintiffs have raised the following four overlapping causes of action: 1) SCAQMD has failed to comply with (and therefore violated) the Clean Air Act's offset requirements in 42 U.S.C. § 7503(c) because it continues to utilize the pre-1990 credits when it has not and cannot verify their validity; 2) SCAQMD has failed to comply with § 7503(c) and the EPA-approved portions of the relevant SIP (i.e. Regulation XIII) because "SCAQMD cannot demonstrate that credits in SCAQMD's offset accounts comply with the CAA offset requirements, including but not limited to, the surplus requirement and SCAQMD Regulation XIII [see Complaint at ¶ 59]"; 3) SCAQMD has violated § 7503(c) and 61 Fed.Reg. 64291-64292 because - "as part of SIP approval, SCAQMD is required to track both emission credits and debits from its offset accounts to ensure that credits are equal to, or greater than, debits resulting in a positive balance [see Complaint at ¶ 63]" - the SCAQMD cannot verify the validity of its pre-1990 credits or otherwise demonstrate that it has (or has had) a positive account balance necessary to permit its distribution of emission offset credits; and 4) SCAQMD violated § 7503(c) and 61 Fed. Reg. 64291-64292 because it has failed to adopt and utilize a tracking system which: a) verifies that the offset credits in its accounts are "real, surplus, quantifiable, enforceable, and permanent," b) would show that SCAQMD's offset

---

[19] Plaintiffs claim that "[i]n the early 00's, EPA requested that SCAQMD provide records to confirm the validity of its pre-1990 credits, but after investing 6,000 person-hours, SCAQMD was unable to provide the necessary verification for a substantial portion of these credits." Complaint at ¶ 39.

accounts have a positive balance at all relevant time frames, and c) would allow "citizens, state regulators, or EPA to verify independently the source of credits either upon deposit into SCAQMD's offset accounts or upon the credits redistribution to polluting facilities [see Complaint at ¶ 71]." At the March 19, 2009 hearing, Plaintiffs' counsel stated that Plaintiffs were "not challenging open-market ERCs that are held by private parties. We are challenging the ERCs [the internal offsets] that are in the district's accounts." *See* March 19, 2009 Reporter's Transcript of Proceedings at pages 26-27.

In their Prayer for Relief, Plaintiffs seek, *inter alia*, injunctive relief directing the SCAQMD to: 1) "cease distributing and remove invalid credits from its offset accounts," 2) "retire invalid credits from its offset accounts," 3) "implement a program, subject to Plaintiffs' approval, that reduces emissions in an amount equivalent to, or greater than, the emissions that were unlawfully allowed by SCAQMD's distribution and sale of invalid credits from its offset accounts," and 4) "adopt a tracking system that complies with the requirements of 42 U.S.C. § 7503(c) and 61 Fed. Reg. at 64291." *See* Complaint at page 18.

## C. **This Court Lacks Jurisdiction over the Alleged Violations of Section 173(c)**

The Complaint alleges in a number of places (and Plaintiffs' first cause of action rests upon the claim) that the SCAQMD directly violated Section 173(c) of the Act, 42 U.S.C. § 7503(c). *See, e.g.*, Complaint ¶¶ 49, 64 and 71. Upon that basis, Plaintiffs seek to bring this action pursuant to Section 304(a) of the Act, 42 U.S.C. § 7604(a)(1). Plaintiffs, however, misconstrue the nature of Section 173 and its function within the Clean Air Act scheme. Section 173 does not set forth "emissions standards or limitations" within the meaning of Section 304 *as such*. Rather, Section 173 describes the general *types* of emissions standards and limitations that a SIP must contain. Simply put, Section 173 establishes requirements for *SIPs*, not *sources*. This court lacks jurisdiction to consider a

17

violation of Section 173 (which deals with the *contents* of permit programs in a SIP[20]), because the Courts of Appeal have exclusive jurisdiction to hear any challenge to the content (or lack of appropriate content) of a SIP. *See* 42 U.S.C. § 7607(b)(1).   Since EPA, not SCAQMD, is responsible for approving SIPs, it is clear that the first claim for relief does not state a valid cause of action against SCAQMD.

Part D of Subchapter 1 of the Clean Air Act is entitled "Plan Requirements for Nonattainment Areas" and it sets forth a variety of provisions relating to SIPs. 42 U.S.C. §§ 7501-09a.   Sections 172 and 173, both contained within Part D, together establish general requirements for the content of SIPs for nonattainment areas.   42 U.S.C. §§ 7502, 7503.   Section 172 is entitled "Nonattainment Plan Provisions in General."   Under Subsection 172(c), each SIP must contain, *inter alia*, the following types of prerequisites:

- provisions requiring the implementation of all reasonably available control measures as expeditiously as practicable - Section 7502 (c)(1);
- provisions designed to achieve attainment of the national ambient air quality standards - *Id.*;
- provisions requiring "reasonable further progress" toward attainment of the national ambient air quality standards - Section 7502 (c)(2);
- an inventory of emissions within the SIP area - Section 7502 (c)(3);
- emissions limitations - Section 7502 (c)(6);
- other "control measures, means, or techniques" - *Id.*;
- schedules and timetables for compliance - *Id.*; and
- a permit program "in accordance with" Section 173 - Section 7502(c)(5).

Section 173, entitled "Permit Requirements," sets forth the general

---

[20] Admittedly, however, a challenge based upon a violation of an emission standard or limitation contained in a SIP could be brought in a district court under 42 U.S.C. § 7604.

18

parameters for the permit programs mandated by Section 172(c)(5).  Under Section 173(a), permit programs must impose various types of conditions on new and/or modified sources of air pollution.  For example, such programs must provide that permits to construct and operate a new or modified source may only be issued if the applicant, *inter alia*: 1) obtains offsets (Section 7503(a)(1)(A)), 2) complies with the lowest achievable emission rate (Section 7503(a)(2)), and 3) demonstrates that all of its other facilities are (or are scheduled to be) in compliance with all applicable emission limitations and standards of the Clean Air Act (Section 7503(a)(3)).   The language of Section 173 clearly contemplates that specific offset requirements applicable to sources will be set forth in the individual SIPs.[21]

Sections 172 and 173 of the Act are not themselves emission standards or limitations; they simply delineate the required contents of SIPs for nonattainment areas.  The only way in which a State or its designee could possibly violate either section would be by promulgating a SIP which infringes on or omits a mandatory provision of those statutes.  However, under the Clean Air Act, a review of a SIP's contents cannot be made in the context of a 42 U.S.C. § 7604(a) action in district court.  As observed in *Communities for a Better Env't*, 180 F.Supp.2d at 1077:

> "Citizen suits . . . are authorized to enforce SIP provisions." *Coalition for Clean Air v. South Coast Air Quality Management District*, 1999 U.S. Dist. LEXIS 16106, *6 (C.D. Cal.) . . . . Plaintiffs seeking to bring a citizen suit for violation of an emission standard or limitations contained in a SIP must allege a violation of a specific strategy or commitment in the SIP; suit may not be maintained solely to force regulators to attain the NAAQs or to modify or amend a SIP to conform to a plaintiff's own notion of proper environmental policy.

---

[21] *See* 42 U.S.C. § 7503(a) ("The permit program required by section 7502[(c)(5)] shall provide . . ."). Section 173(c)(1) describes how applicants may comply "with *any offset requirement in effect under this part*." 42 U.S.C. § 7503(c)(1) (emphasis added). Section 173(c)(2) imposes additional requirements "for purposes of *any such offset requirement*." 42 U.S.C. § 7503(c)(2) (emphasis added).

Before a SIP can be adopted, a State must give "reasonable notice" of the proposed SIP and allow for public hearings. 42 U.S.C. § 7410(a).[22] Persons (who believe that a proposed SIP or revision to a SIP by a State or its designee is defective or in violation of the Act) are obligated to raise their objections at the state level so that the matter can be considered and rectified before the plan or revision is reviewed by the EPA Administrator. *See generally Sierra Club v. Indiana-Kentucky Electric Corp.*, 716 F.2d 1145, 1149-51 (7th Cir. 1983); *Appalachian Power Co. v. EPA*, 579 F.2d 846, 854-55 (4th Cir. 1978). Once adopted by the State, the SIP is reviewed by the EPA Administrator who can either approve it or disapprove it in whole or in part. 42 U.S.C. § 7410(c). If the Administrator disapproves the SIP in whole or in part, unless the State corrects the deficiencies *and* the Administrator approves the plan revision, the Administrator can promulgate a "Federal implementation plan" for the particular nonattainment area. *Id.*; *see also* 42 U.S.C. § 7602(y). Further, "[w]henever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, . . . or to otherwise comply with any requirement of [the Clean Air Act], the Administrator shall require the State to revise the plan as necessary to correct such inadequacies" using the same process as required for the initial adoption of the SIP. 42 U.S.C. § 7410(k)(5). As noted above, it is only upon the approval of the SIP by the EPA Administrator that the provisions of a SIP become enforceable federal law. Therefore, a claim that a State or its designee has violated 42 U.S.C. § 7503(c) can only be based upon the EPA Administrator's approval of the SIP or its revision, and that decision is only reviewable in the Courts of Appeal pursuant to Section 307(b)(1) of the Act, 42 U.S.C. § 7607(b)(1). In addition, as further stated

---

[22] *See* California Health & Safety Code §§ 40460, 40463 and 40466 which provide for public hearings and comment periods prior to the adoption of a SIP or revisions thereto by the SCAQMD and the State Air Resources Board.

1  in 42 U.S.C. § 7607(b)(2): an "[a]ction of the Administrator with respect to which
2  review could have been obtained under [§ 7607(b)(1)] shall not be subject to
3  judicial review in civil or criminal proceedings for enforcement." Consequently, if
4  a claim or objection could have been raised to the EPA Administrator prior to final
5  action being taken, then that claim/objection cannot thereafter be brought through a
6  citizen suit in the district court via 42 U.S.C. § 7604. *See generally Romoland*
7  *School District v. Inland Empire Energy Center, LLC*, 548 F.3d 738, 755 (9th Cir.
8  2008).

9      In their first cause of action, Plaintiffs contend that the SCAQMD's
10 distribution of pre-1990 credits constitutes a violation of Section 173(c) of the
11 ACT (42 U.S.C. § 7503(c)). However, as discussed above, this district court
12 would have no jurisdiction to entertain that claim against the SCAQMD under 42
13 U.S.C. § 7604(a) based *solely* upon a purported violation of Section 173(c) - as
14 opposed to a claim of a violation of a specific provision of a SIP that was
15 promulgated pursuant to Section 173 and approved by the EPA Administrator.
16 First, any violation of Section 173 would have to be brought against EPA in the
17 Ninth Circuit pursuant to Section 307 of the Act (42 U.S.C. § 7607). Section 307
18 is the exclusive means for challenging the content of a SIP or where the dispute as
19 to the agency action is "embedded in a challenge to the validity of an
20 implementation plan." *Abramowitz v. EPA*, 832 F.2d 1071, 1075-76 (9th Cir.
21 1987). Since Section 173 consists entirely of requirements for the content of SIPs,
22 it follows that Section 307 is the exclusive means of alleging a violation of Section
23 173. Such an action must be brought in the applicable Court of Appeals. 42
24 U.S.C. § 7607(b); *Action for Rational Transit v. West Side Highway Project*, 699
25 F.2d 614 (2d Cir. 1983).[23]

---

26 [23] As stated in *Action for Rational Transit*, what the plaintiffs really sought from their lawsuit
27 was "not relief from violations of the existing SIP so much as revisions of the SIP by way of
   relief to make that document conform to [plaintiffs'] notion of proper environmental policy. But
28 to the extent that [plaintiffs] desire to augment or amend the SIP to correct perceived inade-

Second, the gravamen of the Plaintiffs' first cause of action is that the District's internal offsets do not meet the requirements of Section 173(c). This court is without jurisdiction as to that claim for the separate reason that EPA determined in 1996 that SCAQMD's internal offsets met the requirements of Section 173(c) and reiterated that finding in 2006. *See* 71 Fed. Reg. at 35158. This determination was based on the District's use of an uncodified tracking system to ensure the validity of the credits. *Id.* Plaintiffs could have challenged EPA's determinations in 1996 and 2006 in the Ninth Circuit under Section 307, and sought the same relief that they seek here – a judicial determination that the internal offsets do not meet the requirements of Section 173(c). Having failed to do so, the Plaintiffs are precluded from filing an action on the same ground now. Sections 304 and 307 of the Act do not allow concurrent jurisdiction in the Ninth Circuit and district court. *See generally Romoland School District*, 548 F.3d at 755. The Ninth Circuit has *exclusive* jurisdiction to hear any suit that it *could* have heard at any point in the past regarding the EPA's approval of SCAQMD's internal offsets and its use of pre-1990 credits. *Missouri v. U.S.*, 109 F.3d 440, 441 (8th Cir. 1997); *Virginia v. U.S.*, 74 F.3d 517, 523-25 (4th Cir. 1996).

This case is similar to *Delaware Valley Citizens Council for Clean Air v. Davis*, 932 F.2d 256 (3d Cir. 1991). In *Delaware Valley Citizens*, an environmental group brought a citizen suit against the state of Pennsylvania under Section 304. The first, third, and fourth claims in the complaint therein, respectively, alleged that the state violated statutory duties set forth in the Clean Air Act to: 1) adopt a motor vehicle emissions control program in areas that did not meet the ozone standard; 2) revise the SIP periodically based on new methods that would expedite attainment; and 3) attain the ozone standard for certain areas by

---

quacies, their arguments were not properly addressed to the district court. The courts of appeals have exclusive jurisdiction to review SIPs approved by the Environmental Protection Agency...." 699 F.2d at 616.

certain dates. *Id.* at 262. The plaintiff, in other words, sought to directly enforce the Clean Air Act provisions through a Section 304 suit.

The court in *Delaware Valley Citizens* upheld the dismissal of these claims on a Rule 12(b)(1) motion. The court determined that Section 304 "is not available for purely statutory violations" of the Clean Air Act. *Id.* at 266. The court explained as follows:

> Counts One, Three and Four of the Citizens' complaint against Pennsylvania rest on *direct* violations of . . . the statute itself, not violations of any version of the Plan involved in this case. The Citizens' right to bring those claims in the district court must rest on a specific violation of an emission standard or limitation that is in effect under or in accordance with these sections of the Act. Neither § 7410(a)(2)(H)(i) nor § 7502 (b)(11)(B) deal with emission standards or limitations. *They outline what an implementation plan must contain to get EPA approval.* They do not support a citizens' suit under § 7604.

*Id.* at 266 (emphasis added). Section 173 is functionally the same as the statutory provisions at issue in *Delaware Valley Citizens*. Section 173 on its face "outlines what an implementation plan must contain to get EPA approval." That Section does not directly impose any specific offset requirement that can be enforced by Section 304.

Plaintiffs cite *Conservation Law Foundation v. Federal Highway Administration*, 24 F.3d 1465 (1st Cir, 1994) ("*CLF I*") and *Conservation Law Foundation v. Busey*, 79 F.3d 1250 (1st. Cir. 1996) ("*CLF II*") in support of their argument that this district court has jurisdiction over Section 173(c) claims. According to the Plaintiffs, these cases stand for the proposition that Section 173 can be directly enforced under Section 304 because Section 173 is purportedly a "standard of performance" within the meaning of Section 304(f) (42 U.S.C. 7604(f)). The *CLF I* and *CLF II* decisions, however, in no way support Plaintiffs' argument. To the contrary, the cited holding in *CLF I* is not controlling law, and

23

1   the *CLF II* decision actually supports Defendants' position.[24]

2   In *CLF II*, environmental groups brought a citizen suit against the Federal
3   Aviation Administration ("FAA") and other defendants under Section 304. The
4   suit challenged an Air Force base redevelopment project. The plaintiffs in *CLF II*
5   argued that the FAA's approval of the base project violated Section 176 of the Act
6   (42 U.S.C. § 7506). Section 176 prohibits federal agencies from taking any action
7   that "does not conform" to the applicable SIP. Section 176 is commonly known as
8   the Clean Air Act's "conformity provision." The court in *CLF II* expressly
9   considered whether the conformity provision constitutes an "emissions standard or
10  limitation" within the meaning of Section 304(a). *CLF II*, 79 F.3d at 1257.

11  The court in *CLF II* held that Section 304 can only be used to directly
12  enforce compliance with a provision of the Act if two criteria are met. First, as a
13  "threshold" matter, the provision in question must constitute an "emissions
14  standard or limitation" in effect "under" the Clean Air Act or a SIP. Second, the
15  claim must be brought to enforce "specific measures, strategies, or commitments
16  designed to ensure compliance with" the national ambient air quality standards. *Id.*
17  at 1258. The court described this second criteria as the "specificity test." *Id.*

18  The court in *CLF II* concluded that the plaintiffs' claim did not pass the
19  threshold test under Section 304, because the Section 176 conformity provision
20  does not constitute an "emissions standard or limitation" within the meaning of
21  Section 304(a). The court rejected the argument that the Section 176 conformity
22  provision is a "standard of performance" within the meaning of Section 304(f).
23  Section 302(l) defines "standard of performance" as "a requirement of continuous

24

25  [24] The court in *CLF I* held that Section 176 (42 U.S.C. § 7506) is subject to direct enforcement under Section 304 because it constitutes a "performance standard" within the meaning of Section 304(f). This holding, however, was merely dicta because, as the court explained, "the outcome
26  of this case does not depend on our jurisdictional ruling." 24 F.3d. at 1478 n.6. Thus, that court stated that it "remain[ed] free to revisit the issue in a future case where it may be decisive." *Id.*
27  Moreover, that same court did in fact revisit the issue later, and held that Section 176 is *not* an "emission standard or limitation" subject to direct enforcement under Section 304. *CLF II*, 79
28  F.3d at 1257-60.

emission reduction." 42 U.S.C. § 7602(l).  The court in *CLF II* noted that "nothing in [Section 176] imposes an emissions reduction requirement."  *Id.* at 1259.  The court explained that Section 176 merely prohibits a federal agency from supporting activities that do not conform to emissions reduction requirements.  The specific emissions reduction requirements themselves are set out elsewhere, such as in a SIP.  *Id.* at 1259-60; *accord Audubon Naturalist Society v. U.S. Dept. of Trans.*, 524 F.Supp.2d 642, 695-96 (D. Md. 2007).  Because the plaintiffs' claim did not pass the "threshold" test, the court in *CLF II* expressly did not consider the "specificity" issue. *Id.* at 1259 n.2.

Plaintiffs' claim here does not pass the threshold test set forth in *CLF II* because Section 173 does not impose any "emissions standards or limitations" on sources.  As explained above, Section 173 imposes requirements on *SIPs*, not *sources*.

Plaintiffs' claim also fails the "specificity" test set forth in *CLF II* because the general requirements set forth in Section 173 can be accomplished in different ways.  In order to show how offset requirements under Section 173 can differ, one need look no further than Regulation XIII.  The internal offset tracking system currently set forth in Rule 1315 imposes very different requirements than those set forth for privately held ERCs in Rule 1309.  Under Rule 1309, for example, ERCs are individually validated and registered.  In contrast, SCAQMD's internal offset tracking system tracks offsets in the aggregate, because individual offsets become undifferentiated once they are "deposited" or credited into the District's internal bank.[25]  The internal offsets are validated based on specified "reporting periods" (*i.e.* 10/1/90 to 7/31/95; individual years from 8/95 to 7/04; 8/04 to 12/05; and each

---

[25] Rule 1315 is designed to ensure that "the District's offset accounts meet in aggregate the federal nonattainment NSR offset requirements." *See* Rule 1315(a); *see also*, 10/29/96 EPA Technical Support Document at page 15 (indicating approval of SCAQMD's tracking system "which will continuously show that in the aggregate the District, will be able to provide for the necessary offsets required to meet the appropriate statutory offset ratio").  The internal offsets are, of course, differentiated based on the nature of the pollutant. In other words, the District separately accounts for $PM_{10}$ offsets, VOC offsets, etc.

calendar year beginning with 2006). Rule 1315(d). In addition, SCAQMD's internal offset tracking system requires that internal offsets be discounted annually in order to ensure that they are "surplus." Rule 1315(c)(4). In contrast, surplus determinations for privately held ERCs are made on an individual basis under Rule 1309(b)(5).

Some of the requirements set forth in Rule 1309 and 1315 are in direct conflict. Under Rule 1306(c), for example, the amount of ERCs issued to a private applicant is based on the actual emission decrease at a source which is modified or removed from service, reduced to the amount that would be actual if "best available control technology" ("BACT") were applied. In contrast, under Rule 1315, the amount of internal offsets resulting from an orphan shutdown or orphan reduction is based on eighty percent of the source's permitted emission levels. Rule 1315(c)(3)(B). Thus, the calculation of ERCs and internal offsets is different in two key respects. First, ERCs are based on actual emissions, while internal offsets are based on permitted emissions. Second, in calculating the amount of offsets to be issued, emission reductions for ERCs are discounted to BACT levels, while emission reductions for internal offset are not discounted to BACT levels.

Finally, Plaintiffs allege that SCAQMD violated offset requirements established by the EPA regulations set forth in 40 C.F.R. Part 51. Like Section 173, however, the Part 51 regulations merely specify the required content of SIPs. This is abundantly clear from the plain language of the regulations. *See, e.g.*, 40 C.F.R. § 51.160 ("each plan must set forth legally enforceable procedures . . ."); 40 C.F.R. § 51.161 ("the legally enforceable procedures in section 51.160 must also require the State or local agency to provide opportunity for public comment on information submitted by owners and operators"); 40 C.F.R. § 51.161 ("each plan must identify the State or local agency which will be responsible for meeting the requirements of this subpart in each area of the State"). In particular, Plaintiffs cite a provision of 40 C.F.R. § 51.165 relating to offsets. Section 51.165, however,

clearly prescribes the required content of a SIP. Section 51.165(a) generally provides that "State Implementation Plan . . . provisions satisfying sections 172(c)(5) and 173 of the Act shall meet the following conditions . . . . " The specific section cited by Plaintiffs provides as follows:

> (3)(i) Each plan shall provide that for sources and modifications subject to *any preconstruction review program adopted pursuant to this subsection* the baseline for determining credit for emissions reductions is the emissions limit under the applicable State Implementation Plan in effect at the time the application to construct is filed . . . .
>
> . . .
> (ii) The plan shall further provide that:
> . . .
> (C)(1) Emissions reductions achieved by shutting down an existing emission unit or curtailing production or operating hours may be generally credited for offsets if they meet the requirements in paragraphs (a)(3)(ii)(C)(1)(i) through (ii) of this section.
> (i) Such reductions are surplus, permanent, quantifiable, and federally enforceable.

40 C.F.R. § 51.165(a)(3)(ii)(C)(1)(i) (emphasis added). Like Section 173, the Part 51 regulations plainly do not themselves establish enforceable emissions standards or limitations, but rather identify the types of emissions standards and limitations that must be set forth in a SIP.

## C. First Claim for Relief – Pre-1990 Credits

Assuming *arguendo* that this Court had jurisdiction over Plaintiffs' first cause of action (that the SCAQMD violated Section 173(c) because it distributed pre-1990 credits when it cannot verify their validity), that claim would be dismissed pursuant to F.R.C.P. 12(b)(6) as moot. In this action, Plaintiffs seek inter alia to have the SCAQMD "cease distribution and remove invalid credits from its offset accounts." Plaintiffs have not requested that the pre-1990 offsets currently in use by third party facilities to be recalled, but simply to have the

offsets "retired" when the facilities shut down or otherwise cease their utilization of the credits.

The SCAQMD in September of 2006 adopted Rule 1315 which deals in part with the pre-1990 offsets. Rule 1315(c)(1) states:

> The District offset accounts are established with valid credits effective October 1, 1990 for the air contaminant and with the initial account balances as listed in Table A. Any portions of the initial account balances identified in Table A remaining in the District offset accounts at the end of calendar year 2005 shall be removed from the District offset accounts by the Executive Officer and shall not be used for purposes of demonstrating equivalency between federal NSR offset requirements and the District's NSR program.

Under Rule 1315(c)(1), pre-1990 credits have already been removed from the SCAQMD's offset accounts and are not being issued/distributed. See July 6, 2009 Reporter's Transcript of Proceedings at page 6-7. Consequently, the first cause of action attacking the SCAQMD's prior distributions of pre-1990 credits is, at this time, moot.

**D. Second Claim for Relief - Alleged Violation of Regulation XIII**

The Complaint's second claim for relief alleges in relevant part as follows: "Under the SIP-approved requirements of SCAQMD Regulation XIII, SCAQMD has the responsibility to ensure the validity of credits distributed from its offset accounts pursuant to Rules 1304 and 1309.1." Complaint, ¶55. Contrary to what Plaintiffs allege, however, that the EPA-approved portions of Regulation XIII contain no requirements that apply to the creation of internal offsets. The second claim for relief must fail because a citizen suit under Section 304 must allege violations of a *specific duty or duties* set forth in a SIP. *Bayview Hunters Point Community Advocates v. Metropolitan Transportation Commission*, 366 F.3d 692, 703 (9th Cir. 2004) (citizen suits under Section 304 may only be "brought to

enforce specific measures, strategies, or commitments designed to ensure compliance with the NAAQS.")[26] A citizen suit cannot be used to enforce "a SIP's overall objectives or aspirational goals." *Id.* at 701.

The Plaintiffs maintain that Rules 1309 and 1306 apply to SCAQMD's internal offsets. It is clear from the language and context of these Rules, however, that they only apply to ERCs. On its face, Rule 1309 sets forth a process by which a private company files an application with SCAQMD for ERCs. Rule 1309. The validation requirements that the Plaintiffs seek to enforce here, for example, are set forth in Rule 1309(b). Rule 1309(b) is entitled "*Application* for an ERC for a New Emission Reduction." *Id.* (emphasis added). Every subsection of Rule 1309(b) refers to the "application" or the "applicant." In particular, Rule 1309(b)(4) states that "*the applicant* must demonstrate to the Executive Officer or his designee" that the emission reductions are "real," "quantifiable," "permanent," and "federally enforceable." Rule 1309(b)(4) (emphasis added). The requirements of Rule 1309 plainly do not apply to the internal offsets because the internal offsets do not result from an application. As explained above, the internal offsets are generated on SCAQMD's own initiative through the tracking of orphan shutdowns, orphan reductions, and other types of emission reductions. Rule 1315(c)(3). Similarly, the relevant provisions in Rule 1306 apply only to the calculation of "Emission Reduction Credits." Rule 1306(e).

The context of Rules 1309 and 1306 within Regulation XIII also confirms that those Rules do not apply to the District's internal offsets. Rule 1303(b)(2), for example, sets forth the District's basic offset requirement, and provides in pertinent part as follows:

> The Executive Officer or designee shall, except as Rule 1304 applies, deny

---

[26] *See also, Wilder v. Thomas*, 854 F.2d 605, 614 (2d Cir. 1988) ("[P]laintiffs are limited under § 7604 to seeking relief from specific violations of existing SIPs . . . ."); *Council of Commuter Orgs. v. Metro. Transp. Authority*, 683 F.2d 663, 670 (2d Cir. 1982) (citizen suits under Section 304 "must allege a violation of a specific strategy or commitment in the SIP and describe, with some particularity, the respects in which compliance with the provision is deficient").

the Permit to Construct for any new or modified source which results in a net emission increase of any nonattainment air contaminant at a facility, unless each of the following requirements is met:

. . .

(2)   Emission Offsets

Unless exempt from offsets requirements pursuant to Rule 1304, emission increases shall be offset *by either Emission Reduction Credits approved pursuant to Rule 1309, or by allocations from the Priority Reserve in accordance with the provisions of Rule 1309.1.*

Rule 1303(b)(2) (emphasis added).

Rule 1303(b)(2) provides essentially three distinct ways that a new or modified source may satisfy the offset requirement: 1) by showing that they the source is exempt from offset requirements under Rule 1304; 2) by obtaining "Emission Reduction Credits *approved pursuant to Rule 1309*"; or 3) by receiving "allocations from *the Priority Reserve in accordance with the provisions of Rule 1309.1.* (Emphases added)."   The language of Rule 1303(b)(2) belies Plaintiff's entire argument.   If the District's internal offsets were "Emission Reduction Credits approved pursuant to Rule 1309," there would be no need to add the phrase "allocations from the Priority Reserve in accordance with the provisions of Rule 1309.1."  The only logical conclusion that one can draw from the language of Rule 1303(b)(2) is that the District's internal offsets are *not* "approved pursuant to Rule 1309." As explained above, this interpretation is consistent with the plain language of Rule 1309, which governs applications from private companies for ERCs.

Furthermore, while Plaintiffs assert that all emission reduction credits are to be calculated pursuant to Rule 1306, Rule 1306(e)(3) itself states that in calculating ERCs one does not include items such as "all Priority Reserve allocations" and "all offsets obtained pursuant to the exemption provisions of Rule 1304."   Given the fact that Regulation XIII recognizes that there are differences between ERCs and other types of offsets such as Priority Reserve allocations (which are part of SCAQMD's internal offsets), Plaintiffs' contention – that all offsets must be

1 treated as emission reduction credits and subject to the provisions in Rules 1306
2 and 1309 – must be rejected.

3      In addition, the language and very existence of Rule 1315 belie Plaintiffs'
4 argument.   As explained above, different requirements apply to the creation of
5 ERCs and internal offsets.   Under Rule 1309, ERCs are validated individually;
6 under Rule 1315, internal offsets are validated in the aggregate based on specified
7 "reporting periods."  Surplus determinations for privately held ERCs are made on
8 an individual basis under Rule 1309, while internal offsets are discounted in the
9 aggregate on an annual basis to ensure that they remain "surplus."    Rule
10 1315(c)(4). The amount of ERCs is based on the decrease below actual emissions,
11 while the amount of internal offsets is based on the decrease below permitted
12 emissions.   ERCs are based on discounting emissions to BACT levels, while
13 internal offset are not based on BACT discounting.

14      In sum, Plaintiffs' second cause of action fails to state a claim upon which
15 relief can be granted because it is based on the faulty premise that the SCAQMD's
16 internal offsets must comply with the requirements of Rules 1306 and 1309.
17 Internal offsets are not the same as ERC's and are not governed by Rules 1306 and
18 1309, but rather by Rule 1309.1 (which is part of the EPA-approved SIP) and Rule
19 1315 (which is not).

20      **E. The Third and Fourth Claims for Relief - SCAQMD's Alleged**
      **Failure to Adopt an Adequate Tracking System**
21

22      The Complaint's third and fourth claims for relief are based on the
23 contention that the SCAQMD has violated 42 U.S.C. § 7503(c), Regulation XIII
24 and 61 Fed, Req. 64291 because it has failed to adopt a tracking system as to its
25 internal credits that meets the criteria that Plaintiffs assert is required by the Act,
26 the SIP and the EPA (*e.g.* that would show that the SCAQMD has maintained a
27 positive balance as to its offset accounts).  However, nothing in Subchapter 1 of
28 the Clean Air Act (42 U.S.C. §§ 7401-7515) delineates any requirement that a SIP

1  (or a permit program contained within the SIP) include a tracking system as to

2  emission reduction credits or other offsets. Likewise, as conceded by Plaintiffs'

3  counsel, the EPA has not promulgated any regulation with respect to offset

4  tracking systems. *See* December 11, 2008 Reporter's Transcript of Proceedings at

5  page 9. The SIP herein (*i.e.* Regulation XIII) also does not contain such a

6  provision. Rule 1315(c)(3) (which is not part of the EPA-approved SIP) does

7  provide for "Tracking of Offset Account Credits for Federal NSR" but Plaintiffs

8  contend that that rule's tracking scheme fails to ensure that the SCAQMD is

9  complying with applicable federal requirements such as verifying that offset

10 credits be "real, surplus, quantifiable [and] enforceable" and that the SCAQMD

11 offset accounts maintain a positive balance.

12     Plaintiffs' contention as to the tracking system prerequisite is based upon the

13 language set forth in the federal register preamble to EPA's 1996 approval of

14 Regulation XIII. That provision reads as follows:

15     [T]his approval [of Regulation XIII] is based on the understand-
       ding that the District will apply a tracking system which will
16     continuously show in the aggregate that the District: (1) will
17     provide for the necessary offsets required to meet the appropriate
       statutory offset ratio; and (2) will mitigate emissions from those
18     sources exempted from offsets under Rule 1304 which are not
19     exempt from federal regulation.

20 61 Fed. Reg. at 64292. Plaintiffs allege essentially that 1) this preamble provision

21 requires Defendants to track the internal offsets and "maintain positive account

22 balances" and 2) Defendants violated this provision by failing to utilize a tracking

23 system and failing to maintain positive account balances.

24     Contrary to Plaintiffs' assertions, however, the cited preamble passage in no

25 way creates a SIP requirement that can be enforced through a citizen suit under

26 Section 304. As the Ninth Circuit has confirmed, a federal register preamble

27 issued in connection with SIP approval is not part of the approved SIP. *El Comité*

28

*Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008) ("*El Comité*").[27]   Thus, the 1996 preamble is not part of the EPA-approved SIP and, therefore, does not create a SIP duty that can be enforced under Section 304.   Consequently, Plaintiffs' third and fourth claims for relief fail to state a claim for which relief can be granted.[28]

## V.   **CONCLUSION**

Defendants' Motion to Dismiss under F.R.C.P. 12(b)(1) and (b)(6) is granted.[29]

Plaintiffs cannot maintain a citizen suit action under Section 304 of the Act based on the allegations in the Complaint asserting a violation of Section 173(c). Section 173(c) does not contain "emissions standards or limitations" within the meaning of Section 304.   Rather, it sets forth general requirements for SIPs that can be implemented in different specific ways.   Thus, the first cause of action is dismissed under F.R.C.P. Rule 12(b)(6) for failure to state a claim for which relief can be granted.   In addition, Section 173(c) can only be enforced against EPA, and any such action would have to be brought in the Ninth Circuit pursuant to Section

---

[27] Plaintiffs cite *Safe Air for Everyone v. EPA*, 488 F.3d 1088 (9th Cir. 2007), but that case is inapposite.   As recognized by the Ninth Circuit in *El Comité*, the *Safe Air* decision "did not address which documents were and were not part of the SIP." *El Comité*, *supra*, 539 F.3d at 1072.   Rather, the *Safe Air* opinion "involved the interpretation of a SIP whose contents were already established." *Id.*

[28] In dismissing Plaintiffs' third and fourth causes of action, this court is *not* rejecting the contention that a sufficient tracking system would be necessary to assure that SCAQMD's utilization of its internal offsets comports with the requirements of the Clean Air Act.   However, Congress in Section 502(b) of the Act, 42 U.S.C. § 7661a(b), assigned to the EPA Administrator the task of "promulgating . . . regulations establishing the minimum elements of a permit program to be established by any air pollution control agency."   Those elements were to include "monitoring and reporting requirements." *Id.*   The EPA's failure to set out within its regulations a provision for a tracking system and its determination in 1996 that the SCAQMD's "implementation of a tracking system demonstrated that the Priority Reverse bank's emission reduction credits complied with the requirements of section 173(c)" are both matters which can only be raised by the Plaintiffs pursuant to Section 307 (42 U.S.C. §7607) before the Court of Appeals and not to this district court.

[29] The Motion to Dismiss under Rule 12(b)(6) was originally granted with leave to amend. *See* July 6, 2009 Reporter's Transcript of Proceedings at pages 45-47.

307(b)(1). Finally, EPA specifically approved the SCAQMD's use of the pre-1990 credits in 1996 and reiterated that approval in 2006. Therefore, any challenge to the validity of that utilization should have been brought against EPA in the Ninth Circuit earlier. Thus, the first cause of action is dismissed pursuant to F.R.C.P. Rule 12(b)(1) on the additional ground that this court lacks jurisdiction over it.

Regulation XIII does not contain any of the validation requirements for internal offsets which Plaintiffs seek to impose upon the SCAQMD. Contrary to what plaintiffs assert, Rules 1309 and 1306 do not apply to SCAQMD's internal offsets. In the absence of any enforceable EPA-approved SIP requirements, the second claim for relief is dismissed under F.R.C.P. 12(b)(6) for failure to state a claim for which relief can be granted.

Finally, there is no delineated provision for a tracking system as to internal offsets in the Clean Air Act, EPA's regulations or the EPA-approved SIP herein. The federal register preamble to the 1996 SIP approval is not part of the SIP. Thus, the third and fourth causes of action must be dismissed under F.R.C.P. Rule 12(b)(6).

In conclusion, it bears noting that the absence of any validation requirements for internal offsets in the SIP does not mean that SCAQMD is free to ignore the uncodified validation requirements. Under the Act, EPA exercises continuing authority over SCAQMD in accordance with, *inter alia*, the "SIP call" provision described above. Under Section 110(k)(5) of the Act (42 U.S.C. § 7410(k)(5)), EPA can and will exercise its SIP call authority to require revisions to an adopted SIP if EPA determines that the SIP is inadequate. Thus, the effect of this ruling is not that internal offset validation provisions cannot be enforced; it is simply that Plaintiffs cannot enforce those provisions in the district court through Section 304

/ / /

/ / /

/ / /

34

in the absence of any specific requirements in the SIP.

IT IS SO ORDERED.

Dated: This _7th_ day of January, 2010.


_George H. Wu_
GEORGE H. WU
United States District Judge